UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KATHY ECHEVVARIA,                              :

                   Plaintiff,            :            13 Civ. 4980 (LAK) (AJP)

           -against-              :            **REPORT AND RECOMMENDATION**

DIVERSIFIED CONSULTANTS, INC.,                 :

                 Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

          Plaintiff Kathy Echevarria[1] brings this action against debt collection agency Diversified Consultants alleging willful violations of the Telephone Consumer Protection Act ("TCPA").  (Dkt. No. 1: Compl. ¶¶ 13-19.)  Specifically, Echevarria alleges that Diversified "willfully violated TCPA 47 U.S.C. § 227(b)(A)(iii) by waging a campaign of computer generated unauthorized autodialed telephone calls to [Echevarria's] mobile telephone" while knowing that the telephone number did not belong to the person they sought to contact, Magda Molano.  (Compl. ¶¶ 10, 15, 17.)

          Presently before the Court are the parties' cross-motions for summary judgment. (Dkt. No. 15: Diversified Notice of Motion; Dkt. No. 21: Echevarria Notice of Motion.)  For the reasons set forth below, Echevarria's motion should <u>GRANTED</u> and Diversified's motion should be <u>DENIED</u>.

---

[1]    The caption misspells Ms. Echevarria's last name, following the erroneous spelling in the complaint.  The Clerk of Court is requested to amend the caption to reflect the correct spelling.

## FACTS

**Background**

Echevarria's cell phone number is (917) XXX-1803.  (Dkt. No. 22: Echevarria Rule 56.1 Stmt. ¶¶ 1, 4; Dkt. No 33: Diversified Rule 56.1 Counter-Stmt. ¶¶ 1, 4.)[2/]  On January 31, 2013, debt collection agency Diversified Consultants placed a call through its LiveVox dialing system to Echevarria's cell phone number, which it thought belonged to debtor Magda Molano.  (Dkt. No. 26: Diversified Rule 56.1 Stmt. ¶¶ 1-4; Dkt. No. 31: Echevarria Rule 56.1 Counter-Stmt. ¶¶ 1-4; Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 8.)  Echevarria asserts that the next day, February 1, 2013, she called Diversified to inform them that she was not Magda Molano and to request that she not receive any further calls.  (Echevarria Rule 56.1 Stmt. ¶¶ 5-6; Echevarria Rule 56.1 Counter-Stmt. ¶ 3; Dkt. No. 24: Sasson Aff. Ex. A: Echevarria Dep. at 20, 117, 139-40.)[3/]  Diversified disputes this allegation and alleges that at no point did it either reach a live person or receive a call from Echevarria.  (Diversified Rule 56.1 Stmt. ¶ 3; Diversified Rule 56.1 Counter-Stmt. ¶¶ 5-6, 9; Dkt. No. 17: Pye Aff. ¶¶ 3-4.)  In an attempt to reach Molano, Diversified called (917) XXX-1803 twenty-seven times until March 25, 2013 (when it received Echevarria's lawsuit).  (Diversified Rule 56.1 Stmt. ¶ 3; Echevarria Rule 56.1 Stmt. ¶¶ 6, 9; see also Sasson Aff. Ex. C: Molano Account History at 2-3.)

---

[2/]   The Court has redacted Echevarria's phone number to preserve her privacy (although neither her counsel nor Diversified did so in their submissions).

[3/]   Although Echevarria maintains that she called Diversified on February 1, 2013 (e.g., Echevarria Dep. at 20, 139-40), Magda Molano's Diversified account history shows a call on February 1, 2013 from Diversified to Echevarria's phone number, resulting in a "Tran[s]ferred call" (Sasson Aff. Ex. C: Molano Account History at 2).  The issue of who made the call, Echevarria or Diversified, is not material.

**The LiveVox Dialing System**

   Diversified uses the LiveVox system to make collection calls to debtors.  (Dkt. No. 26: Diversified Rule 56.1 Stmt. ¶ 4; Dkt. No. 31: Echevarria Rule 56.1 Counter-Stmt. ¶ 4; Dkt. No. 22: Echevarria Rule 56.1 Stmt. ¶ 10; Dkt. No. 33: Diversified Rule 56.1 Counter-Stmt. ¶ 10.)  Each morning, a Diversified employee loads into the LiveVox system approximately three to three-and-one-half million phone numbers.  (Diversified Rule 56.1 Stmt. ¶ 7; Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶¶ 11, 13; Dkt. No. 24: Sasson Aff. Ex. B: Sullivan Dep. at 22.)  Using the LiveVox system, Diversified calls upwards of ninety percent of those phone numbers on a daily basis.  (Sullivan Dep. at 23; Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 12.)  The inputted phone numbers are stored until midnight, when they are wiped from the system.  (Diversified Rule 56.1 Stmt. & Echevarria Counter-Stmt. ¶ 8; Echevarria Rule 56.1 Stmt. ¶ 13; Sullivan Dep. at 24-25.)  The LiveVox system selects the numbers to be called according to a protocol or strategy entered by Diversified.  (Diversified Rule 56.1 Stmt. ¶ 7; Echevarria Rule 56.1 Stmt. ¶¶ 14-15.)  When a call is answered, the LiveVox dialing system connects the called party with a live Diversified representative.  (Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 15.)[4/]

   The process works as follows: when a Diversified representative is ready to begin communicating with debtors, the representative logs into the LiveVox system and toggles a button within the application indicating that the representative is ready to receive live callers.  (Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 16.)  Using a pre-programmed algorithm designed

---

[4/]  While Diversified's collection operators have the ability to manually dial a specific debtor, this practice is generally reserved for high balance corporate account collectors.  (Diversified Rule 56.1 Counter-Stmt. ¶ 14; see Echevarria Rule 56.1 Stmt. ¶ 14; Sullivan Dep. at 74.)

to limit the amount of time between calls, LiveVox begins to simultaneously call multiple debtors. (Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶¶ 17-18.) The Diversified representative receives an audible "beep" in their headset once the LiveVox system connects with a debtor and transfers the call. (Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 20.) In this manner, the LiveVox dialing system "operates exactly as a predictive dialer would." (Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶¶ 18, 21; see also page 10 below.)[5]

## ANALYSIS

## I.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., No. 12-4431-cv, --- F. App'x ----, 2014 WL 185010 at *1 (2d Cir. Jan. 17, 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., No. 12-4517, --- F. App'x ----, 2013 WL

---

[5]   Echevarria maintains that the numbers uploaded into the LiveVox system are dialed at random (Echevarria Rule 56.1 Stmt. ¶ 22), while Diversified claims that the numbers are called in accordance with the algorithms uploaded with the numbers each morning. (Diversified Rule 56.1 Stmt. ¶ 7; Echevarria Rule 56.1 Stmt. & Diversified Counter-Stmt. ¶ 22.)

6284286 at *1 (2d Cir. Dec. 5, 2013); <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994); <u>Gallo</u> v. <u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  <u>See</u>, <u>e.g.</u>, <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. at 323, 106 S. Ct. at 2552-53; <u>Dolan</u> v. <u>Cassella</u>, No. 12-2486, --- F. App'x ----, 2013 WL 6150763 at *1 (2d Cir. Nov. 22, 2013).

   To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  <u>Scott</u> v. <u>Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); <u>see</u>, <u>e.g.</u>, <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. at 587, 106 S. Ct. at 1356; <u>Alzawahra</u> v. <u>Albany Med. Ctr.</u>, 2013 WL 6284286 at *1; <u>Weinstock</u> v. <u>Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), <u>cert. denied</u>, 540 U.S. 811, 124 S. Ct. 53 (2003).

   In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 255, 106 S. Ct. at 2513.[6] The Court draws all inferences in favor of the non-moving party only after determining that such

---

[6]  <u>See also</u>, <u>e.g.</u>, <u>Crown Castle NG E. Inc.</u> v. <u>Town of Greenburgh, N.Y.</u>, No. 13-2921-cv, --- F. App'x ----, 2014 WL 185012 at *2 (2d Cir. Jan. 17, 2014); <u>Alzawahra</u> v. <u>Albany Med. Ctr.</u>, 2013 WL 6284286 at *1; <u>Feingold</u> v. <u>New York</u>, 366 F.3d 138, 148 (2d Cir. 2004); <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d at 36; <u>Gallo</u> v. <u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d at 1223.

inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

When there are cross-motions for summary judgment:

> The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . .  Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.

Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).[7]

---

[7]    Accord, e.g., Parent v. New York, 485 F. App'x 500, 503 (2d Cir.), cert. denied, 133 S. Ct. 652 (2012); Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); Law Debenture Trust Co.

(continued...)

## II.   ECHEVARRIA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AND DIVERSIFIED'S MOTION SHOULD BE DENIED

### A.   There is No Genuine Factual Dispute as to Whether Diversified Called Echevarria Using an Automatic Telephone Dialing System

#### 1.   The Telephone Consumer Protection Act

Echevarria alleges that Diversified called her cell phone using an automatic telephone dialing system ("ATDS") in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii).  That portion of the Act makes it unlawful for:

> any person . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  Under § 227(b)(3), a person may bring an action to recover the greater of actual monetary loss for a violation or $500 in statutory damages for each violation, the latter of which may be trebled if the violation was wilful or knowing.  47 U.S.C. § 227(b)(3)(B).  "The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages."  Alea London Ltd. v. Am. Home Servs., Inc.,

---

[2/]   (...continued)
v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010); Bronx Household of Faith v. Bd. of Educ. of N.Y., 492 F.3d 89, 96 (2d Cir. 2007); Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988); Eastman Mach. Co. v. United States, 841 F.2d 469, 473-74 (2d Cir. 1988); Charron v. Sallyport Global Holdings, Inc., 12 Civ. 6837, 2014 WL 464649 at *2 (S.D.N.Y. Feb. 3, 2014); BMC–The Benchmark Mgmt. Co. v. V3 231, LLC, 12 Civ. 7921, 2013 WL 5420982 at *4 (S.D.N.Y. Sept. 27, 2013); Bodur v. Palisades Collection, LLC, 829 F. Supp. 2d 246, 250-51 (S.D.N.Y. 2011) (Peck, M.J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d 280, 291 (S.D.N.Y. 2009); Alfano v. CIGNA Life Ins. Co., 07 Civ. 9661, 2009 WL 222351 at *13 (S.D.N.Y. Jan. 30, 2009) (Lynch, D.J.); Revlon Consumer Prods. Corp. v. Estee Lauder Cos., 00 Civ. 5960, 2003 WL 21751833 at *7 (S.D.N.Y. July 30, 2003) (Peck, M.J.).

638 F.3d 768, 776 (11th Cir.), <u>cert. denied</u>, 132 S. Ct. 553 (2011); <u>see also</u>, <u>e.g.</u>, Branham v. <u>ISI</u> <u>Alarms, Inc.</u>, No. 12-CV-1012, 2013 WL 4710588 at *8 (E.D.N.Y. Aug. 30, 2013).  Accordingly, to prove a violation of the TCPA, Echevarria must show that: "'(1) a call was placed to a cell or wireless phone; (2) by the use of any automatic dialing system . . . and (3) without prior consent of the recipient.'"  <u>Harris</u> v. <u>World Fin. Network Nat'l Bank</u>, 867 F. Supp. 2d 888, 892 (E.D. Mich. 2012) (quoting <u>Pugliese</u> v. <u>Prof'l Recovery Serv., Inc.</u>, No. 09-12262, 2010 WL 2632562 at *7 (E.D. Mich. June 29, 2010)).  To qualify as an ATDS under the Act, equipment "need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it."  <u>Satterfield</u> v. <u>Simon & Schuster, Inc.</u>, 569 F.3d 946, 951 (9th Cir. 2009).

Section 227(a) defines "automatic telephone dialing system" as "equipment which has the capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  Congress empowered the Federal Communications Commission ("FCC") to prescribe regulations to implement the TCPA's requirements.  47 U.S.C. § 227(b)(2).  In 2003, the FCC adopted rules addressing the technological advances made by the telemarketing industry.  <u>See</u> <u>In re</u> <u>Rules & Regulations Implementing the</u> <u>Telephone Consumer Protection Act of 1991, Report and Order</u>, 18 F.C.C. Rcd. 14014, 14017 ¶¶ 1-2, 2003 WL 21517853 (F.C.C. July 3, 2003) ("<u>2003 Report</u>").  The FCC sought to ensure that consumers continued to receive the protection from unwanted solicitation calls that Congress intended in enacting the TCPA.  <u>2003 Report</u> at 14017 ¶ 2.

Recognizing the proliferation of predictive dialer use in telemarketing, the FCC in 2002 had invited comments on whether predictive dialers fall within the restrictions placed on ATDS's.  <u>See</u> <u>2003 Report</u> at 14090 ¶ 129.  A predictive dialer is defined as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting

when a sales agent will be available to take calls." <u>2003 Report</u> at 14091 ¶ 131.  Moreover, "[t]he hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, <u>or from a database of numbers</u>."  <u>2003 Report</u> at 14091 ¶ 131 (emphasis added).  Although the sophistication of these devices exceeds that of dialing equipment previously used to arbitrarily generate ten-digit numbers, the FCC acknowledged that the "basic function" remained the same–namely, "the <u>capacity</u> to dial [phone] numbers [en masse] without human intervention" or oversight.  <u>2003 Report</u> at 14092 ¶ 132.

            In evaluating whether a predictive dialer is an ATDS under the TCPA, the FCC focused on Congress's intent to prevent automated phone calls to telephone numbers "for which the consumer is charged for the call," such as cell phones.  <u>2003 Report</u> at 14092 ¶ 133.  Because the purpose of predictive dialers is to do precisely that, the FCC concluded that excluding them from the definition of automatic telephone dialing equipment would be an exception that swallows the rule.  <u>2003 Report</u> at 14092 ¶ 133.   The protected class of phone numbers, including cell phone numbers, would remain vulnerable to relentless harassment by telemarketers by virtue of the hollow distinction that their number was dialed from a list rather than randomly generated.   <u>Id.</u> Accordingly, the FCC ruled that "a predictive dialer falls within the meaning and statutory definition of 'automated telephone dialing equipment' and the intent of Congress."  <u>2003 Report</u> at 14093 ¶ 133.  In 2008, the FCC issued a Declaratory Ruling reaffirming that "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."  <u>In re</u> <u>Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling</u>, 23 F.C.C. Rcd. 559, 556 ¶ 12, 2008 WL 65485 (F.C.C. Jan. 4, 2008) ("<u>2008 Declaratory Ruling</u>").

### 2.        The LiveVox System is an Automatic Telephone Dialing System

Echevarria asserts that LiveVox is a predictive dialer as defined by the FCC and therefore an ATDS under the FCC's rules implementing the TCPA.  (Dkt. No. 23: Echevarria SJ Br. at 4-5.)  Diversified defends that LiveVox cannot be a predictive dialer, despite its own employee's admissions, because it lacks the capacity to store or produce telephone numbers.  (Dkt. No. 28: Diversified Opp. Br. at 3, 6-7; see also Dkt. No. 26: Diversified Rule 56.1 Stmt. ¶¶ 5-8.)  Whether summary judgment is appropriate turns on whether the evidence presented shows that there is no genuine dispute as to whether LiveVox is a predictive dialer and therefore an ATDS.

In support of her motion, Echevarria offers the following evidence that the LiveVox system is a predictive dialer.  Jamie Sullivan, Diversified's Director of Data Services, repeatedly admitted at his deposition that the LiveVox system "acts as a predictive dialer."  (Dkt. No. 24: Sasson Aff. Ex. B: Sullivan Dep. at 32-33, 38, 78.)  Sullivan explained that more than three million telephone numbers are uploaded into the LiveVox system every morning.  (Sullivan Dep. at 22, 30.)  Using an algorithm and a pre-set strategy uploaded by Diversified, the LiveVox system dials numbers using statistical data to achieve the least amount of wait time between calls.  (Sullivan Dep. at 32-35.)[8/]  LiveVox also is directed to call numbers in accordance with other filters, such as time

---

[8/]     The strategies involve determining the order in which each phone number on a given account is called.  Sullivan explained:

> So what it will do is the strategy will dictate which number is called first, second, or third.  Like, for instance, if the first number is busy, it will put the account into the second number to call the second number.  But the strategy dictates which particular number in the list that [Diversified uploads to LiveVox] is called first and which is called second.

(Sullivan Dep. at 34-35.)  Thus, on day one, the strategy might direct LiveVox to call the debtor's home phone number first; on day two, it might direct the debtor's cell phone to be
(continued...)

zones or state and local laws.  (Sullivan Dep. at 41, 43.)[9]  The numbers within those filters are dialed

sequentially by the order in which they were uploaded, usually by account number.  (Sullivan Dep.

at 43.)  The LiveVox system, not Diversified's collection agents, places the calls.  (Sullivan Dep. at

30.)[10]  Sullivan gave the following example:

> [S]ince it's a predictive dialer . . . it has an algorithm that decides how many lines
> they need to increase it by or when they need to start making calling.  So, if all your
> agents are on the phone or let's say there are a couple of them not ready and all of
> them are on the phone and there's no one available, then the lines dialed will go to
> zero, and there won't be any calls made when [LiveVox is] waiting for somebody to
> be available again.
>
> Then let's say one agent becomes available.  And let's say [LiveVox is]
> dialing 50 lines per agent as an example.  Then, if you're looking at the management
> software, it will show 50 lines start dialing to try and get a call to the available agent.

(Sullivan Dep. at 38.)

Sullivan's description comports with the definition of a predictive dialer promulgated

by the FCC.  The LiveVox system "dial[s] numbers" and "assists telemarketers in predicting when

---

[8]  (...continued)
called first.  (Sullivan Dep. at 35.)

[9]  For example, at 8:00 a.m., calls are placed only to accounts on the east coast.  (Sullivan Dep.
at 43.)

[10]  Sullivan testified:

> Q.    Who makes the phone call itself?
>
> A.    Well, if we're using Live[Vox], Live[Vox] is making the call.  Their
> computer is the one that is making the phone call out and then connecting it
> to the live agent.

(Sullivan Dep. at 30.)  Diversified's collection agents have the ability to dial numbers
manually, but that protocol is reserved for only about fifteen percent of Diversified's
collectors servicing high balance corporate accounts.  (Sullivan Dep. at 74.)

a sales agent will be available to take calls." (Compare Sullivan Dep. at 32-35, with 2003 Report, 18 F.C.C. Rcd. 14014, 14091 ¶ 131, 2003 WL 21517853 (F.C.C. July 3, 2003).)   Moreover, LiveVox dials numbers drawn "from a database of numbers." (Compare Sullivan Dep. at 22, with 2003 Report at 14091 ¶ 131.)  LiveVox places the calls "without human intervention." (Compare Sullivan Dep. at 30, with 2003 Report at 14092 ¶ 132.)  It is undisputed that Diversified uploads in excess of three million phone numbers every morning and those numbers remain in the system, where they are dialed automatically by LiveVox pursuant to that day's strategy, until midnight, when they are erased.  (See page 3 above.)  Indeed, Diversified's Jamie Sullivan explicitly admitted that LiveVox is a "predictive dialer."  (Sullivan Dep. at 32-33, 38, 78.)  Accordingly, because LiveVox is a predictive dialer, it constitutes an ATDS.  See Meyer v. Portfolio Recovery Assocs. LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) (Defendant's "predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system.'"), cert. denied, 133 S. Ct. 2361 (2013); Swope v. Credit Mgmt., LP, No. 12CV832, 2013 WL 607830 at *4 (E.D. Mo. Feb. 19, 2013) (The FCC has twice "held that predictive dialers are considered automatic telephone dialing systems subject to the TCPA, and that debt collectors are not exempt from the statute's prohibitions."); Vance v. Bureau of Collection Recovery LLC, No. 10-cv-06324, 2011 WL 881550 at *2 (N.D. Ill. Mar. 11, 2011) ("[T]he Court notes that the FCC has indicated, and other courts have held, that predictive dialing systems do meet the definition of devices prohibited by the TCPA.").

        Diversified maintains that the telephone numbers are not "stored" in the LiveVox system at any time and that holding that the numbers are stored would convert every cell phone into an ATDS.  (Dkt. No. 28: Diversified Opp. Br. at 2, see also page 14 n.13 below.)  This argument is defeated by a memorandum produced and distributed by LiveVox concerning potential liability under the TCPA, which Diversified submitted to the Court.  (Dkt. No 17: Pye Aff. ¶¶ 5-6 & Ex. A:

LiveVox Memo.) LiveVox itself admits "that the LiveVox Application Service, <u>while able to store or produce telephone numbers to be called</u> . . . ." (LiveVox Memo at 1.) The LiveVox Memo clarifies that while its product can indeed store numbers, it cannot store or produce numbers for the particular purpose of random or sequential generation. (LiveVox Memo at 1.) LiveVox noted that its "view is not unanimously held, with one court ruling that LiveVox's Application Service is indeed an ATDS that is subject to the TCPA." (LiveVox Memo at 1.) The LiveVox Memo, and Diversified's arguments, ignore the FCC's rule-making authority, whereby a system that stores numbers from a database and calls those numbers qualifies as a prohibited predictive dialer, even if the numbers are not called randomly or sequentially. (<u>See</u> pages 8-9 above.)[11]

        Diversified points to a Ninth Circuit case and a Northern District of Alabama case to support its assertion that LiveVox cannot be an ATDS without the capacity to store telephone numbers. (<u>See</u> Dkt. No. 28: Diversified Opp. Br. at 3-5.)[12] Diversified's reliance on these cases is fundamentally flawed. In <u>Hunt</u> v. <u>21st Mortgage Corp.</u>, 12-CV-2697, 2013 WL 5230061 (N.D. Ala.

---

[11]    In <u>Leyse</u> v. <u>Clear Channel Broadcasting, Inc.</u>, No. 10-3739, --- F. App'x ----, 2013 WL 5926700 (6th Cir. Nov. 5, 2013), the Sixth Circuit held that the FCC's rules were entitled to <u>Chevron</u> deference because "the [TCPA] statute is replete with evidence that Congress intended the FCC to promulgate rules carrying the force of law that determine what kinds of prerecorded calls are permissible and what kinds are not." <u>Id.</u> at *8. Diversified's attempt to obscure their relevance is of no avail.

[12]    Diversified's brief supporting its summary judgment motion asserts that a court has already determined that LiveVox is not an ATDS. (Dkt. No. 16: Diversified SJ Br. at 7.) This assertion is disingenuous. In <u>O'Connor</u> v. <u>Diversified Consultants, Inc.</u>, No. 11-CV-1722, 2013 WL 2319342 (E.D. Mo. May 28, 2013), the district court was presented with a motion for class certification. <u>Id.</u> at *1. The court denied the motion, noting in dicta in a footnote that Diversified had presented "compelling evidence" that LiveVox was not an ATDS under the TCPA. <u>Id.</u> at *4 n.6. Diversified did not move for summary judgment on that issue and the court considered the issue only as to its potential impact on the class certification decision. <u>Id.</u> There was no definitive ruling or determination made, nor was there any mention in the opinion as to what that evidence was.

Sept. 17, 2013), the telephone system in question was incapable of automatic dialing, and could only have achieved that capability through substantial modification.  Id. at *4.  Thus, while Diversified correctly states the court's holding that the phone system was not an ATDS (Diversified Opp. Br. at 5), that holding simply is not applicable to the present facts.  Indeed, the district court in Hunt agreed with other cases that held that telephone systems fully equipped to automatically dial numbers had the "capacity" to meet the definition of "automatic telephone dialing system."  Hunt v. 21st Mortgage Corp., 2013 WL 5230061 at *4 (quotations omitted).  The system at issue in Hunt was not so equipped, but the LiveVox system is.[13]

Likewise, the other case cited by Diversified (Diversified Opp. Br. at 3-4), Satterfield v. Simon & Schuster, No. 06-2893, 2007 WL 1839807 (N.D. Cal. June 26, 2007), rev'd & remanded, 569 F.3d 946 (9th Cir. 2009), also is inapposite.  In Satterfield, the district court held that the system used by Simon & Schuster's promotional campaign was not an ATDS because it used lists of numbers, not random or sequentially generated telephone numbers.  2007 WL 1839807 at *5-6.  The district court stated that the FCC's "commentary" was not entitled to Chevron deference.  Id.  The Ninth Circuit rejected the district court's holding, finding that the FCC's rules have "the force of law and [are] therefore entitled to Chevron deference . . . ."  Satterfield v. Simon & Schuster, 569 F.3d at 953.  The Ninth Circuit remanded in light of that determination, finding that because the district

---

[13]   Drawing on the Hunt court's iPhone analogy, Diversified posits the slippery slope argument that if LiveVox is found to be an ATDS, so must the roughly twenty million American iPhone users.  (Diversified Opp. Br. at 2, 5.)  Again, Diversified's contention presents a fundamental misunderstanding of the Hunt court's analysis.  Because the system at issue could only automatically dial numbers if significantly upgraded, i.e., it could not do so in its present state, the court reasoned that if it were to hold that system to be an ATDS, the same could then be said for iPhones because there exists a possibility that they could at some future point be upgraded.  See Hunt v. 21st Mortgage Corp., 2013 WL 5230061 at *4.  The court clarified, however, that were those iPhones to presently contain such an "app" permitting them to store or produce telephone numbers for the purpose of calling them, those iPhones likely would fall within the purview of § 227(b)(1)(A).  See id.

court focused on the random number generation issue, there remained a genuine issue of fact as to whether the system in fact had the "capacity" to be an ATDS.  Id. at 949, 951.  Therefore, this Court finds neither Hunt nor Satterfield to be supportive of Diversified's position.  Rather, the evidence -- including the LiveVox Memo and Diversified's Jamie Sullivan's admission -- is that LiveVox is a predictive dialer that under the FCC's rules interpreting the TCPA, is an ATDS covered by the TCPA.

### 3.    Echevarria Never Consented to Phone Calls From Diversified

The TCPA explicitly exempts from liability autodialed calls to a cell phone "made with the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  "[P]rior express consent" is "an affirmative defense for which the defendant bears the burden of proof."  Grant v. Capital Mgmt. Servs., L.P., 449 F. App'x 598, 600 n.1 (9th Cir. 2011) (citing 2008 Declaratory Ruling, 23 F.C.C. Rcd. 559, 565 ¶ 10, 2008 WL 65485 (F.C.C. Jan. 4, 2008) ("[W]e conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent.")); see also, e.g., Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d 1316, 1318-19 (S.D. Fla. 2012); Pugliese v. Prof'l Recovery Serv., Inc., No. 09-12262, 2010 WL 2632562 at *7 (E.D. Mich. June 29, 2010).

It is undisputed that Echevarria never consented to receive calls from Diversified.  "'Prior express consent' to be contacted on a cell phone via an ATDS in regards to a particular debt has been deemed granted in situations where a plaintiff provided his or her cell phone number to a creditor during the transaction that resulted in that particular debt."  Levy v. Receivables Perf. Mgmt. LLC, No. 11-CV-3155, --- F. Supp. 2d ----, 2013 WL 5310166 at *7 (E.D.N.Y. Sept. 23, 2013); see also Castro v. Green Tree Serv. LLC, 10 Civ. 7211, --- F. Supp. 2d ----, 2013 WL 4105196 at *17 (S.D.N.Y. Aug. 14, 2013).  Diversified acknowledges that it obtained Echevarria's

number through a "skip-trace."  (Dkt. No. 24: Sasson Aff. Ex. D: Diversified Interrogatory Responses ¶ 4; <u>see also</u> Sasson Aff. Ex. B: Sullivan Dep. at 54.)  A skip-trace is "the process of developing new telephone, address, job or asset information on a customer, or verifying the accuracy of such information."  <u>Meyer</u> v. <u>Portfolio Recovery Assoc., LLC</u>, 707 F.3d 1036, 1040 n.1 (9th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 2361 (2013).  "The skip tracers then use their particular talents to discover the debtors' whereabouts.  The skip tracers pass this information back to the collection agencies, which may then contact the debtors or their employers to attempt collection of the debt through garnishment of wages or otherwise."  <u>United States</u> v. <u>Cummings</u>, 395 F.3d 392, 394 (7th Cir. 2005).  Diversified obtained and called Echevarria's number without her consent.

Accordingly, the Court concludes that Diversified has failed to raise an issue of fact as to whether the LiveVox system is an automatic telephone dialing system.  It is further undisputed that Diversified used LiveVox to place twenty-seven phone calls to Echevarria's cell phone without her permission.  Therefore, summary judgment should be <u>GRANTED</u> in favor of Echevarria on the issue of Diversified's liability under the TCPA.

**B.    There is No Genuine Factual Dispute as to Whether Diversified's Violations of Section 227 were Willful**

In addition to moving for summary judgment on liability, both parties urge this Court to grant summary judgment in their favor on the question of whether Echevarria may recover treble damages for Diversified's TCPA violations.  (Dkt. No. 23: Echevarria SJ Br. at 11-13; Dkt. No. 28: Diversified Opp. Br. at 6-8.)

A person that successfully establishes a TCPA violation under § 227(b)(1)(A)(iii) may recover "actual monetary loss from such a violation, or . . . receive $500 in damages for each such violation, whichever is greater."  47 U.S.C. § 227(b)(3)(B).  Moreover, if the Court finds that

the defendant engaged in willful or knowing violations of the Act, "the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B)," i.e., three times the actual monetary loss resulting from the violation or $1500 in damages for each violation, whichever is greater.  47 U.S.C. § 227(b)(3).

The TCPA does not define "willfully" and "knowingly."  There is a split of authority as to what constitutes a willful or knowing violation.  The court in Texas v. Am. Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001), adopted a heightened standard because "[t]he Federal Communications Commission has interpreted 'willful or knowing' under the Telecommunications Act (of which the TCPA is a part), as not requiring bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute."  Id. at 899.[14]  Other courts, however, have interpreted willful or knowing to mean volitional or intentional, requiring that a plaintiff need only show that a defendant voluntarily made the impermissible communication that violated the TCPA.  See, e.g., Bridgeview Health Care Ctr. Ltd. v. Clark, No. 09 C 5601, 2013 WL 1154206 at *7 (N.D. Ill. Mar. 19, 2013) ("[T]he Court adopts the more common interpretation that 'willfully' or 'knowingly' simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute."); Stewart v. Regent Asset Mgmt. Solutions, No. 10-CV-2552, 2011 WL 1766018 at *7 (N.D. Ga. May 4, 2011); Sengenberger v. Credit Control Svcs., Inc., No. 09 C 2796, 2010 WL 1791270 at *6 (N.D. Ill. May 5, 2010), adhered to on reconsideration, 2010 WL 6373008 (N.D. Ill. June 17, 2010).

Diversified's conduct satisfies either standard.

---

[14]   See also In re Monitronics Int'l, Inc. Tel. Consumer Prot. Act Litig., No. 13-md-2493, 2014 WL 316476 at *5 (N.D. W.Va. Jan. 28, 2014); Maryland v. Universal Elections, Inc., 862 F. Supp. 2d 457, 463 (D. Md. 2012), aff'd, 729 F.3d 370 (4th Cir. 2013); Harris v. World Fin. Network Nat'l Bank, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012).

### 1.      Diversified Knew or Should Have Known That LiveVox was an ATDS

Diversified knew or should have known that LiveVox was an ATDS. LiveVox's own manufacturer cautioned that the system stores numbers and that a court already had held LiveVox to be an ATDS subject to the TCPA. (Dkt. No. 17: Pye Aff. Ex. A: LiveVox Memo at 1; see also pages 12-13 above & page 23 below.) Diversified employee Jamie Sullivan testified that the LiveVox system acts as a "predictive dialer" and that numbers are uploaded, stored, and called during the day by the LiveVox system. (See pages 10-12 above.) Moreover, Diversified was aware of the TCPA restrictions on ATDS's because of its prior TCPA litigation. (See Dkt. No. 16: Diversified SJ Br. at 7-8.) See, e.g., Stewart v. Regent Asset Mgmt. Solutions, 10-CV-2552, 2011 WL 1766018 at *7 (N.D. Ga. May 4, 2011). Given this substantial evidence, the Court finds that Diversified knew or should have known that using the LiveVox system constituted using an ATDS subject to TCPA requirements.

### 2.      Diversified Knew or Should Have Known That it was Calling the Wrong Person

Likewise, the Court finds that Diversified knew or should have known that it was calling the wrong person. In support of her summary judgment motion on this issue, Echevarria offers (1) her deposition testimony stating that the day after receiving the first phone call, she contacted Diversified and informed them that she was not Magda Molano, that it had the wrong number, and that it should cease calling her (Dkt. No. 24: Sasson Aff. Ex. A: Echevarria Dep. at 20, 117, 139-40); (2) her AT&T wireless phone records indicating that she placed a call to Diversified[15]

---

[15]    The Court was able to make this determination by dialing the number, (201) 942-4418, and taking judicial notice that a recording stated that the number belonged to Diversified Consultants. See McPhatter v. M. Callahan & Assocs., LLC, No. 11 CV 5321, 2013 WL 3981106 at *1 (E.D.N.Y. Aug. 2, 2013) (taking judicial notice that a phone number belonged (continued...)

on February 1, 2013 at 1:38 p.m. (Dkt. No. 35: Sasson Supp. Aff. Ex. B: AT&T Account History);

and (3) Diversified's account history for Magda Molano, indicating that Diversified had a phone call

from Echevarria at 1:38 p.m. on February 1, 2013 (Sasson Aff. Ex. C: Molano Account History at

2).   Molano's account history shows that after Echevarria informed Diversified of its error on

February 1, Diversified made twenty-six additional calls, the last occurring on March 25, 2013.

(Molano Account History at 1-3.)

        Diversified conclusorily alleges that the first time it was made aware that the number

did not belong to Magda Molano was when Echevarria filed this suit.  (Dkt. No. 17: Pye Aff. ¶ 4.)

Diversified also points to the portion of Echevarria's deposition where the following exchange

occurred:

> Q.     Have you ever received any calls, at all, from any debt collection agency.
>
> A.     I have received calls from a debt collection agency.  Not on my person, though.
>
> . . . .
>
> Q.     And do you know the name of that company or debt collection agency?
>
> A.     I don't remember.  I don't know.
>
> Q.     Was it Diversified Consultants?
>
> A.     I don't know.
>
> . . . .
>
> Q.     Now, when was the first time that you spoke to any company and told them that you
>          don't know a Magda Molano and requested that they cease calling you further?
>
> A.     The very first time I got a call.

---

[15/]     (...continued)
          to defendant), report & rec. adopted, 2013 WL 5209926 (E.D.N.Y. Sept. 13, 2013).
          Notwithstanding that plaintiff's counsel in McPhatter is the same as here, this seemingly
          important evidence was not presented in Echevarria's motion papers.

Q.      Do you remember when that was?

A.      To be honest, no.

(Dkt. No. 35: Sasson Supp. Aff. Ex. A: Echevarria Dep. at 15-17; see also Dkt. No. 28: Diversified

Opp. Br. at 6-7.)  While this deposition testimony, taken alone, may have tended to show confusion

by Echevarria as to which debt collection agency she had called, Echevarria clarified her testimony

a page later in her deposition:

Q.      Do you recall the telephone number they [the debt collection agency] were calling
        from?

A.      It was a 201 area code, and it would usually end with a 14 or 18. . . .

Q.      Can you be certain that you spoke to the same company every time?

A.      It was the same phone number that kept calling.

. . . .

Q.      Do you believe that you were speaking to the same agency or company every single
        time?

A.      Yes.

Q.      So there was only really one company that has been calling you?

A.      I guess so, yes.

(Echevarria Dep. at 18-19.)  Bolstering Echevarria's position are her own phone records, which show

an outgoing call made on February 1, 2013 at 1:38 p.m. to (201) 942-4418 (AT&T Account History

at 1), which is Diversified's number (see page 18 n.15 above).  Moreover, Diversified's own record

of Magda Molano's account history shows a call at 1:38 p.m. on February 1, 2013 to Echevarria's

cell phone bearing the comment "Tran[s]ferred call." (Molano Account History at 2.)[16]  This is

---

[16]     While it remains unclear who initiated the February 1 call, it is undisputed that a call
         occurred on that date and time and that it was the only call of the twenty-seven that resulted
         (continued...)

especially significant given Diversified's conclusory position that it never spoke with Echevarria

(Dkt. No. 33: Diversified Rule 56.1 Counter-Stmt. ¶¶ 4-5 (denying that Diversified ever spoke with

Echevarria)), and because every other phone call made by Diversified to Echevarria's number

resulted in a dropped call, a no answer, or a hang-up.  (Molano Account History at 1-3.)  Thus,

Echevarria has substantiated her claim with both sworn testimony and supporting documentary

evidence, while Diversified has offered nothing beyond a misconstrued portion of Echevarria's

deposition transcript and a conclusory statement in a Diversified employee's affidavit that is

undercut by Diversified's own records.  There may be a dispute, but it is not a genuine dispute.

Accordingly, the Court finds that Diversified's conduct was willful because

Diversified knew or should have known that (1) it was using LiveVox, that was (or at least might

be held to be) an ATDS and (2) it was calling the wrong person despite being notified of the error

on February 1, 2013.  No reasonable juror could conclude otherwise.  See Scott v. Harris, 550 U.S.

372, 380, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment."); MLB Props., Inc. v. Salvino, Inc., 542 F.3d 290, 319 (2d Cir. 2008) ("Conclusory

statements, conjecture, and speculation are insufficient to create a genuine factual dispute.");

Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) ("[N]onmoving parties . . . 'may not rely

on conclusory allegations or unsubstantiated speculation.'" (quoting Fujitsu Ltd. v. Fed. Express

Corp., 247 F.3d 423, 428 (2d Cir.), cert. denied, 534 U.S. 891, 122 S. Ct. 206 (2001)));

---

[16/]    (...continued)
in a transfer to a Diversified debt collecting employee.  (Compare Molano Account History
at 2 (denoting that the call was "TO" Echevarria's number), with AT&T Account History at
1 (labeling the call as "Jersey NJ," as opposed to "INCOMI").)

Bezuidenhout v. Abbott Labs. & Co., 918 F. Supp. 2d 144, 157 (E.D.N.Y. 2013) ("[E]ven an affidavit with non-conclusory statements may, in some cases, be insufficient to create a factual issue when: (1) it constitutes almost the sole or exclusive basis for a disputed issue of fact in the case; and (2) it is so lacking in credibility that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant because the testimony is incomplete or replete with inconsistencies and improbabilities.").[17]

### C.   Calculation of Damages

Echevarria has not attempted to demonstrate any actual damages in this case.  Rather, Echevarria urges this Court to apply the statutory damages of $500 per violation, trebled to $1500 per violation because Diversified's conduct was in willful and knowing violation of the statute. Echevarria seeks these enhanced damages for all twenty-seven of Diversified's phone calls or, alternatively, for the twenty-six calls made after Echevarria's Feburary 1, 2013 notification.  (Dkt. No. 23: Echevarria SJ Br. at 12-13.)  Prior to Echevarria notifying Diversified that she was not Magda Molano, Diversified could not have known that it was calling Echevarria without consent. Accordingly, the first phone call to Echevarria was not in willful or knowing violation of the TCPA. See Harris v. World Fin. Network Nat'l Bank, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012); Whaley v. T-Mobile, USA, Inc., No. 13-31, 2013 WL 5155342 at *3 n.4 (E.D. Ky. Sept. 12, 2013). However, the remaining twenty-six calls were made after Echevarria informed Diversified on February 1, 2013 that she was not Magda Molano.  The Court therefore finds that an award of treble damages for the twenty-six post-notification calls is appropriate.  Damages should be calculated as

---

[17]   Accord, e.g., Augusta v. Cmty. Dev. Corp. of Long Island, 363 F. App'x 79, 80 (2d Cir. 2010); Reyes v. City of N.Y., 11 Civ. 7084, --- F. Supp. 2d ----, 2014 WL 173412 at *3 (S.D.N.Y. Jan. 16, 2014).

follows: $500 for the first call plus $13,000 for the twenty-six additional calls, trebled to $39,000, for a total of $39,500.

In a plea for mitigation, Diversified defends that it "had (and ha[ve]) no reason to believe that LiveVox is an ATDS." (Dkt. No. 28: Diversified Opp. Br. at 7.)  Diversified contends that this belief was informed in good faith by a memo distributed by the manufacturer of LiveVox. (Diversified Opp. Br. at 7-8.)  Diversified additionally invokes Texas v. Am. Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001), for the proposition that the damages provision is more properly read as providing a ceiling (i.e., up to $500 per violation), not a hard and fast requirement.  See 164 F. Supp. 2d at 900.  The Court is not persuaded by either argument.  First, the LiveVox Memo contains a panoply of statements reminding customers that "uncertainty persists" about the scope of the TCPA, that "this document does not constitute legal advice," that LiveVox's view "is not unanimously held," and that, in fact, one court has already ruled "that LiveVox's Application Service is indeed an ATDS that is subject to the TCPA."  (LiveVox Memo at 1.)[18/]  Consequently, Diversified's claim of reliance is belied by the LiveVox Memo itself.  Second, Congress has explicitly given courts discretion when awarding damages under § 227(c) for telephone solicitation violations, but that discretionary language is not contained in § 227(b).  Compare 47 U.S.C. § 227(c)(5) (permitting damages "up to $500" for each violation), with § 227(b)(3)(B) (requiring "$500 in damages for each such violation . . . ."); see also Adamcik v. Credit Control Servs., Inc., 832 F. Supp. 2d 744, 754 (W.D. Tex. 2011) ("Congress has given courts discretion to award less than $500 per violation of the telephone solicitation subsection of the TCPA, § 227(c), but required

---

[18/]     While it is true that neither Echevarria nor this Court has been able to locate that case, the fact remains that the memo, on its face, severely undercuts Diversified's attempt to mitigate the extent of treble damages.

24

a $500 minimum for autodialer violations under § 227(b).").  Moreover, the damages in <u>American Blastfax</u>, $2.34 billion, were in an entirely different stratosphere than the treble damages awarded here.  <u>Texas</u> v. <u>Am. Blastfax, Inc.</u>, 164 F. Supp. 2d at 900 n.8.  When faced with a damages award of that magnitude, courts have been wary that the award may violate due process or constitute an "excessive fine" under the Eighth Amendment and have adjusted them accordingly.  <u>See</u> <u>Maryland</u> v. <u>Universal Elections, Inc.</u>, 862 F. Supp. 2d 457, 465 (D. Md. 2012), <u>aff'd</u>, 729 F.3d 370 (4th Cir. 2013).  Nothing in this case warrants such an adjustment.

Diversified should be ordered to pay $39,500 in damages for its twenty-seven violations of the TCPA, twenty-six of which were willful or knowing.

## <u>CONCLUSION</u>

For the reasons set forth above, Echevarria's summary judgment motion (Dkt. No. 21) should be <u>GRANTED</u>, Echevarria should be awarded $39,500 in damages, and Diversfied's summary judgment motion (Dkt. No. 15) should be <u>DENIED</u>.

## <u>FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>Ingram</u> v. <u>Herrick</u>, 475 F. App'x 793, 793 (2d Cir. 2012); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d

25

1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984

F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992), <u>cert. denied</u>, 506

U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d

Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy</u> v. <u>Manson</u>, 714

F.2d 234, 237-38 (2d Cir. 1983).


Dated:          New York, New York
                February 28, 2014

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:          All Counsel
                        Judge Lewis A. Kaplan